

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 27, 2021**

United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Stone Panels, Inc., and | § | Case No. 16-32856 |
| Stone Panels Holding Corp., | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |

---

| | | |
|---|---|---|
| | § | |
| Robert Yaquinto, Chapter 7 Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 16-03143-hdh |
| | § | |
| Thompson Street Capital Partners, | § | |
| Thompson Street Capital Partners L.L.C., | § | |
| and Thompson Street Capital Partners | § | |
| III, L.P., | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

As part of a refinancing transaction in 2014, Stone Panels, Inc. ("SPI") and Stone Panels

Holding Corp. ("Holding") jointly borrowed roughly $14 million that was immediately transferred

to Thompson Street Capital Partners III, L.P. ("Thompson Street") to partially satisfy a debt for which only Holding was obligated. Robert Yaquinto, as Chapter 7 Trustee (the "Trustee") seeks avoidance of that transfer from SPI to Thompson Street. Despite being able to show that the transaction was a transfer of an interest of SPI in property for which SPI did not receive reasonably equivalent value, the Trustee was not able to show that SPI (1) was insolvent on the date that such transfer was made or became insolvent as a result of such transfer, (2) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with SPI was an unreasonably small capital, or (3) intended to incur, or believed that it would incur, debts that would be beyond SPI's ability to pay as such debts matured. Based on the following Findings of Fact and Conclusions of Law, the Court determines that the Trustee has not met his burden of proof and accordingly grants judgment in favor of the Defendant.

## I. **Jurisdiction and Venue**

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(A), (H), and (O). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a). The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[1]

## II. **Factual Background**

SPI was a manufacturer of composite paneling that consisted of a solid surface veneer affixed to an aluminum honeycomb support layer. The solid surface veneers were made from thin slices of marble, granite, or limestone, and this paneling was used for both the interior and exterior

---

[1] Any Finding of Fact more properly construed as a Conclusion of Law shall be considered as such, and *vice versa*.

of buildings of various types in the United States and internationally. SPI claimed that, in addition to being faster to install and more cost-effective, these thin stone panels were certifiably better than traditional stone from a performance standpoint.

The original technology was developed in the 1960s but was acquired by the predecessor to SPI, which was then acquired by Peter Myles in the 1980s. In approximately 2004, the company was sold and was under the control of Metapoint Partners ("Metapoint"), a Boston-based equity firm.

## A. The Marketing Process for SPI

On or about December 5, 2013, SPI and its shareholders, including Metapoint, retained Bigelow LLC ("Bigelow") as an investment banker to assist in marketing SPI to potential purchasers. Bigelow prepared a Confidential Investor Presentation with disclosures about SPI's financial condition, management team, and financial projections[2] and began soliciting purchasers for SPI in January 2014.

During this marketing process, Bigelow received nineteen indications of interest in purchasing SPI. The average indication of interest value was $30,500,000. The highest indication of interest value was $50,000,000, provided by CertainTeed.[3] Following a failed attempt to broker a sale to CertainTeed, Bigelow reopened its marketing process and re-engaged in discussions with several interested parties, including Thompson Street. Four potential bidders sent letters of intent to Bigelow, indicating various enterprise values and planned leverage amounts.[4]

After evaluating the letters of intent, SPI entered into an exclusive period with Thompson Street, and Thompson Street performed substantial due diligence during this period. In a

---

[2] Defendant's Exhibit 115.

[3] Defendant's Exhibit 61, p. 3.

[4] Defendant's Exhibit 61, p. 5.

memorandum prepared for Thompson Street's Investment Committee, Thompson Street identified risks associated with the acquisition, such as (i) cyclical core markets, (ii) heavy project orientation resulting in "lumpy orders and shipments," and (iii) potential low-cost competition from China.[5] Even with these identified risks, Thompson Street perceived SPI as an attractive investment, as a growing backlog of booked deals appeared to promise profits in the future. Harry Holiday, the Chief Operating Officer of Thompson Street Capital Manager LLC at the time, testified that Thompson Street saw numerous opportunities in SPI. Mr. Holiday testified that SPI was a backlog-driven business, as the backlog was a primary indicator of what sales may be in the coming year. According to Mr. Holiday, not only was the growing backlog a positive, but Thompson Street also saw opportunities to improve communication between various teams at SPI and to better coordinate scheduling so as not to have inefficient downtime on the shop floor between jobs. Additionally, both SPI's management and Thompson Street noted that SPI's plant was running well under capacity.[6]

Thompson Street ultimately decided to acquire SPI, but for slightly less than the $36,000,000 Thompson Street originally contemplated in its letter of intent. SPI's financial statements for the period ending April 30, 2014, as prepared by Teague Marquess and Associates, showed total assets of $12,255,910, including goodwill of $367,210, and total current liabilities of $8,308,362, consisting largely of accounts payable, accrued liabilities, customer deposits, and deferred contract income.[7] By fiscal year ending April 30, 2014, SPI reported that sales had grown

---

[5] Trustee's Exhibit 30, p. 11.

[6] Trustee's Exhibit 30, p. 10; Trustee's Exhibit 72, p. 42.

[7] Trustee's Exhibit 33.

to $24,329,318.[8] Thompson Street agreed to purchase the stock of SPI from the SPI shareholders and option holders for approximately $34,000,000.

## B. Thompson Street's Acquisition of SPI

On or about July 28, 2014, Holding was formed to facilitate Thompson Street's acquisition of SPI. From its inception, Holding was controlled and principally owned by Thompson Street. The general structure of the transaction was that Holding purchased the stock of SPI, but Thompson Street funded the purchase with (1) cash funded to Holding as a capital contribution in the amount of $20,300,000 and (2) a loan to Holding in the amount of $16,000,000.

More specifically, on July 31, 2014, the following occurred (collectively referred to as the "July 2014 Transaction"):

(a) Holding and other signatories executed a Stock Purchase Agreement (the "Stock Purchase Agreement"), which was stated to be by and among (i) Holding (referred to therein as the "Buyer"), (ii) SPI, and (iii) certain shareholders (referred to therein as the "Sellers").

(b) Holding purchased all of the then outstanding shares of SPI for $34,000,000 (subject to adjustments).

(c) Approximately $29,215,695.82 was transferred (either immediately or via payment to an escrow) to the Sellers, as provided in the Stock Purchase Agreement.

(d) An additional, approximate $1,592,259.48 was likewise transferred to pay various "Transaction Expenses" to or for the benefit of the Sellers.

(e) That certain $16,000,000 "8% Convertible Promissory Note" (the "Thompson Street Note")[9] was executed, delivered, and transferred that same date (at the request of Thompson Street) by Holding payable to Thompson Street.

Pursuant to the acquisition, Holding received all of the then-remaining issued and outstanding capital stock of SPI with the exception of those shares owned, either directly or

---

[8] Trustee's Exhibit 33.

[9] Trustee's Exhibit 3.

beneficially, by Timothy Friedel and Thomas Taylor, who chose to exchange their SPI shares for shares in Holding.  Holding was, from and after the July 2014 Transaction, the holding company for SPI, and Holding's primary asset was its equity in SPI.

In connection with this acquisition phase, Transcend Valuation LLC provided an ASC 805 valuation of SPI as of July 31, 2014 to allocate the value of SPI to its assets.[10]  Based on Thompson Street's acquisition price, the Transcend Valuation Report showed the value of SPI's goodwill as roughly $20 million.

## C. The Replacement of the Thompson Street Note with Financing from Third Party Lenders

While Thompson Street originally provided the entire amount of the funding for the acquisition of SPI, Thompson Street's intention was to replace the Thompson Street Note, which had a maturity date of July 31, 2015, with longer-term financing from third party lenders.  Prior to the July 2014 Transaction, Thompson Street had been working with The PrivateBank and Trust Company ("PrivateBank") to arrange permanent financing.  PrivateBank and Thompson Street finalized this financing, together with subordinated financing from Brookside Mezzanine Fund III, L.P. ("Brookside"), on September 19, 2014 (collectively referred to as the "September 2014 Transaction").  The general structure of the September 2014 Transaction was that Holding and SPI would borrow $8,000,000 from PrivateBank under a secured term note, approximately $1,000,000 from PrivateBank under a secured revolving note, and $5,000,000 from Brookside under an unsecured note.  The proceeds of these loans would then be used to partially satisfy the Thompson Street Note, and the remaining balance of the Thompson Street Note would be converted to equity in Holding.  More specifically, on September 19, 2014, the following occurred:

(a) SPI and Holding executed, delivered, became obligated on, and transferred to PrivateBank:

---

[10] Trustee's Exhibit 68.

     i.    a Loan and Security Agreement (the "PrivateBank Loan Agreement");[11]

    ii.    a Term Note in the principal amount of $8,000,000 (the "PrivateBank Term Note")[12] (all of which was fully drawn on September 19, 2014);

    iii.    a Revolving Note in the principal amount of $4,000,000 (the "PrivateBank Revolving Note")[13] (of which approximately $1,000,000 was drawn on September 19, 2014);

    iv.    a Pledge Agreement between Holding, on the one hand, and PrivateBank, on the other hand (pertaining to Holding's equity interests in and to SPI); and

    v.    those various form UCC-1 documents relating to certain of the foregoing.

(b) SPI and Holding executed, delivered, became obligated on, and transferred to Brookside:

    i.    a Subordinated Loan Agreement (the "Brookside Loan Agreement");[14] and

    ii.    a $5,000,000 Subordinated Promissory Note (the "Brookside Promissory Note"),[15] which was recorded as unsecured debt.

There were three other notable components of the September 2014 Transaction. First, $14,427,777.78 of proceeds of the above-referenced loans were drawn and sent directly from PrivateBank and Brookside to Thompson Street (the "Thompson Street Cash Transfer"). As such, no proceeds of the above-referenced loans were received or retained by SPI. Second, Thompson Street exchanged approximately $2,000,000 in principal under the Thompson Street Note for 174.17 shares of preferred stock and an additional 8,296.62 shares of common stock in Holding[16]

---

[11] Trustee's Exhibit 6.

[12] Trustee's Exhibit 12.

[13] Trustee's Exhibit 22.

[14] Trustee's Exhibit 9.

[15] Trustee's Exhibit 13.

[16] The terms of the Thompson Street Note authorized the holder to convert, at its will, the outstanding principal into common stock and preferred stock of Holding during the note's term.

and cancelled the remaining balance on the Thompson Street Note. Third, SPI and Holding granted PrivateBank a security interest in substantially all of their tangible and intangible personal property and assets.

**D. SPI's Operational Issues Following its Acquisition**

In the years following Thompson Street's acquisition of SPI, several operational problems arose. SPI lost a significant portion of its experienced labor workforce due to immigration documentation issues. SPI's customers placed more complex orders and shifted to materials that were more difficult for SPI to work with. Customers also delayed projects, which created additional challenges for SPI's production facilities. The cumulative effect of these problems was too much for SPI to handle, and both SPI and Holding (together, the "Debtors") filed petitions for relief under Chapter 11 of the Bankruptcy Code on July 21, 2016.

### III. Procedural Background

On November 1, 2016, the Official Committee of Unsecured Creditors, on behalf of SPI and Holding, filed a complaint against PrivateBank and its successors and assignees.[17] The original complaint sought to disallow portions of PrivateBank's alleged secured claims and to recover various allegedly fraudulent transfers from PrivateBank.

Effective as of December 16, 2016, the Debtors' chapter 11 cases were converted to chapter 7 and Robert Yaquinto was appointed as Trustee. The Trustee made substantial revisions to the original complaint by filing an amended complaint ("First Amended Complaint").[18] The First

---

[17] *Complaint Against the PrivateBank and Trust Company to (1) Object to Amount of Claim, (2) Avoid Security Interests on Certain Assets, (3) Determine Secured Status of Claim, (4) Determination of Extent of Priority and Enforceability of Liens, (5) Avoid and Recover Setoffs; (5) Avoid and Recover Preferential Transfers; (6) Avoid and Recover Intentional and Constructive Fraudulent Transfers; and (7) Equitably Subordinate Claim* [Docket No. 1].

[18] *First Amended Complaint (1) Objecting to Amounts of Claims and Seeking to Avoid and Disallow Certain Underlying Claims, (2) To Avoid Security Interests on Certain Assets, (3) To Determine Secured Status of Claims, (4) To Determine Extent, Priority and Enforceability of Various Claims, Liens and Encumbrances, (5) To Avoid and*

Amended Complaint expanded the relief sought in the original complaint through the addition of over forty defendants, including Thompson Street and two of its affiliates (collectively, the "Thompson Street Entities").

On June 1, 2021, following compromises and settlements with various defendants, the Trustee filed another amended complaint (the "Second Amended Complaint"),[19] which only included causes of action against the Thompson Street Entities. The Second Amended Complaint primarily sought the avoidance of various allegedly fraudulent transfers made to the Thompson Street Entities.

On June 7, 2021, the Thompson Street Entities filed a motion for summary judgment[20] along with a brief in support[21] requesting dismissal of Counts 1 and 2 of the Second Amended Complaint and dismissal of all the Thompson Street Entities except for Thompson Street Capital Partners III, L.P. The Court held a hearing on the motion for summary judgment on July 1, 2021, and issued its oral ruling on July 9, 2021, granting summary judgment (1) as to Count 1, which sought avoidance of the transfer of the Thompson Street Note to Thompson Street in connection with the July 2014 Transaction, (2) as to Count 2, which sought avoidance of the Thompson Street Cash Transfer in connection with the September 2014 Transaction, but only to the extent Holding was the plaintiff seeking avoidance, and (3) as to the entire Second Amended Complaint as it related to Thompson Street Capital Partners and Thompson Street Capital Partners, L.L.C.[22] As a

---

*Recover Setoffs; (6) To Avoid and Recover Preferential Transfers; and (7) To Avoid and Recover Constructive or, Alternatively, Actual Fraudulent Transfers* [Docket No. 33].

[19] *Second Amended Complaint to Avoid and Recover Constructively Fraudulent and/or Preferential Transfers* [Docket No. 168].

[20] *Thompson Street Defendants' Motion for Summary Judgment* [Docket No. 173].

[21] *Brief in Support of Thompson Street Defendants' Motion for Summary Judgment* [Docket No. 174].

[22] *Order Granting the Thompson Street Defendants' Motion for Summary Judgment in Part* [Docket No. 218].

result, the Court permitted trial to proceed as to Counts 2 through 5 against the only remaining defendant, Thompson Street Capital Partners III, L.P.

On July 27, 2021, the Court entered the *Joint Pre-Trial Order* [Docket No. 231] submitted by the parties in which they were able to stipulate to a significant number of the facts relevant to this action. The Court held a trial on this matter from July 26, 2021 through July 29, 2021, and took the matter under advisement.

## IV. Legal Analysis

The Trustee argues that the Thompson Street Cash Transfer was a constructively fraudulent transfer as to SPI under both the Bankruptcy Code and the Texas Business and Commerce Code (the "TBCC"). The statutes for constructive fraudulent transfers under the Bankruptcy Code and the TBCC have similar requirements but are stated slightly differently.

Under the TBCC, a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. TBCC § 24.006(a). In addition, a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. TBCC § 24.005(a)(2).

Under section 548(a)(1)(B) of the Bankruptcy Code, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within two years before the date of the filing of the petition if the debtor received less than a reasonably equivalent value in exchange for such transfer and (I) was insolvent on the date that such transfer was made or became insolvent as a result of such transfer; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Both the Bankruptcy Code and the TBCC require a showing that a transfer was made by the debtor and that the debtor received less than reasonably equivalent value. Both statutes also require a showing of fragile financial conditions in the form of either insolvency, inadequate capitalization, or believing the debtor would incur debts beyond its ability to repay after the transaction. The Trustee, as the party seeking to avoid the transaction, bears the burden of proof by a preponderance of the evidence on all elements of a claim for constructive fraudulent transfer. *See Aurzada v. Jenkins (In re Jenkins)*, 617 B.R. 91, 102-03, 110-11 (Bankr. N.D. Tex. 2020). The Court will address each of these elements in turn.

## A. A Transfer of an Interest of the Debtor in Property

The Court believes it is fairly clear that the Thompson Street Cash Transfer was a transfer of SPI's property, but wishes to address an argument to the contrary advanced by Thompson Street. In an oral ruling issued on July 9, 2021, the Court granted summary judgment to Thompson Street on Holding's fraudulent transfer claim based on the September 2014 Transaction. This ruling was based on the finding that Holding received the benefit of the cancellation of the Thompson Street Note, for which only Holding was obligated, in exchange for the Thompson Street Cash Transfer.

Thompson Street now argues that this finding necessarily means that the Thompson Street Cash Transfer came only from Holding, and to find that the transfer came from SPI would be to count the transfer twice. The Court's ruling did not say quite as much as Thompson Street claims.

In order to grant summary judgment to Thompson Street against Holding in connection with the September 2014 Transaction, the Court only needed to find that Holding did not receive less than reasonably equivalent value in exchange for the transfer to Thompson Street. Since Holding received the full value of cancellation of $14 million of the Thompson Street Note, it did not matter whether Holding transferred all of the $14 million of the jointly-borrowed funds to Thompson Street, some portion of the funds, or none at all. Under any set of facts, the Thompson Street Cash Transfer could not have been a constructively fraudulent transfer as to Holding because Holding did not receive less than reasonably equivalent value in exchange for the transfer, and that is why summary judgment was appropriate.

The Court believes it is relevant that both Holding and SPI were designated as borrowers under the PrivateBank Loan Agreement,[23] the PrivateBank Term Note,[24] the PrivateBank Revolving Note,[25] the Brookside Loan Agreement,[26] and the Brookside Promissory Note[27] and that SPI was the obvious source of creditworthiness in the transaction. In addition, while payment of the Thompson Street Note was an approved use of the proceeds under the loan documents, the borrowers were also allowed to use the proceeds for capital expenditures, general corporate

---

[23] Trustee's Exhibit 6.

[24] Trustee's Exhibit 12.

[25] Trustee's Exhibit 22.

[26] Trustee's Exhibit 9.

[27] Trustee's Exhibit 13.

purposes, transaction expenses, and working capital.[28]  Thus, had the proceeds not been transferred to Thompson Street, they could have been available for use by SPI.  As a borrower of the loan proceeds at issue and the primary source of creditworthiness in the transaction, the Court is comfortable concluding that SPI had an interest in the proceeds that were transferred to Thompson Street.  *See, e.g.*, *Bash v. Sun Trust Banks, Inc. (In re Ohio Bus. Machines, Inc.)*, No. 06-8005, 2007 WL 177941, at *5 (B.A.P. 6th Cir. Jan. 25, 2007) ("The mere fact that the funds were to be used to pay a debt owed solely by [the holding company] did not obviate the fact that [the holding company's] debt was paid with funds in which [the debtor] had an interest since [the lender] had loaned the funds to both [the debtor] and [the holding company] and each was severally obligated for the funds' repayment.").

## B.  Reasonably Equivalent Value

Whether a debtor received reasonably equivalent value is a two-part inquiry that considers (1) whether the debtor received value, and (2) whether that value was reasonably equivalent. *German Pellets La., L.L.C. v. Wessel GmbH (In re La. Pellets, Inc.)*, 838 F. App'x 45, 49 (5th Cir. 2020).  For any such value to be reasonably equivalent, the debtor must receive value that is substantially comparable to the worth of the transferred property.  *Id.* (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994)).  "Although the minimum quantum necessary to constitute reasonably equivalent is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value*.*" *Id.* at 50 (citing *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-26 (5th Cir. 1993), *abrogated in part on other grounds by Texas Truck Ins. Agency, Inc. v. Cure (In re Dunham)*, 110 F.3d 286, 288-89 (5th Cir. 1997)).

---

[28] *See* Trustee's Exhibit 6, p. 29 (sections 2.1(a) and 2.2(a) of the PrivateBank Loan Agreement); Trustee's Exhibit 9, p. 16 (section 2.1 of the Brookside Loan Agreement).

The transfer at issue is the Thompson Street Cash Transfer in which roughly $14 million borrowed jointly by Holding and SPI was transferred to Thompson Street in satisfaction of roughly $14 million of the amount owing under the Thompson Street Note.  The problem is that only Holding received the benefit of the paydown of the Thompson Street Note because SPI was not obligated to pay that debt.  Nevertheless, Thompson Street has argued that SPI received other benefits from the September 2014 Transaction that constitute reasonably equivalent value, such as access to Thompson Street's banking and capital markets relationships and access to a new $4,000,000 revolving line of credit.

While the Court agrees that indirect benefits could be included in a calculation of reasonably equivalent value, there was no evidence from which to determine the actual value of the claimed indirect benefits in this case.  There was also no evidence that SPI's access to a new revolving line of credit could not have been achieved without the September 2014 Transaction.  In any event, it is fairly clear that whatever the value of any benefits may have been, it was not reasonably equivalent to the value of the jointly-borrowed proceeds transferred to Thompson Street.  The Court concludes that SPI did not receive reasonably equivalent value for the Thompson Street Cash Transfer.

## C.  Fragile Financial Conditions

Section 548(a)(1)(B)(ii) provides three ways for a plaintiff to satisfy the financial conditions requirement for a constructive fraudulent transfer,[29] and those three ways overlap substantially with the requirements for showing a constructive fraudulent transfer under Texas law. The Trustee may show that the debtor (1) was insolvent on the date that such transfer was made

---

[29] For the sake of completeness, there is a fourth way to satisfy section 548(a)(1)(B)(ii), not applicable to this action, if the debtor made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

or became insolvent as a result of such transfer,[30] (2) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital,[31] or (3) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.[32]

At trial, both the Trustee and Thompson Street offered extensive evidence regarding the financial condition of SPI, both in the form of exhibits and testimony from qualified experts.[33] The parties generally discussed insolvency independently and the adequate capital and cash flow tests together, and the Court will address them in the same fashion.

### 1. Insolvency

The Bankruptcy Code defines insolvent, with regard to an entity other than a partnership or a municipality, as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Courts refer to this test as a balance sheet test and engage in the "fair valuation" of the debts and assets shown on the debtor's balance sheet. *Orix Credit Alliance v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994). The fair value of property is not determined by simply looking at the values assigned on a balance sheet, but by "estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions." *Id.* The insolvency evaluation through the balance sheet analysis should include consideration of the debtor as a "going concern" and

---

[30] Bankruptcy Code section 548(a)(1)(B)(ii)(I); *see also* TBCC section 24.006(a) (requiring a showing that "the debtor was insolvent at [the time of the transfer] or the debtor became insolvent as a result of the transfer").

[31] Bankruptcy Code section 548(a)(1)(B)(ii)(II); *see also* TBCC section 24.005(a)(2) (requiring a showing, as one of two options, that the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction").

[32] Bankruptcy Code section 548(a)(1)(B)(ii)(III); *see also* TBCC section 24.005(a)(2) (requiring a showing, as one of two options, that the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due").

[33] Defendant's Exhibit 109; Defendant's Exhibit 110; Defendant's Exhibit 112.

asset values associated with such a classification. *Weaver v. Kellogg*, 216 B.R. 563, 576 (S.D. Tex. 1997).

In reaching its conclusions on "fair valuation," this Court may adopt the asset values of one party or the other, or the Court may choose its own fair valuation figure after weighing all the evidence. *See Williams v. Wu (In re TTC Plaza L.P.)*, No. 13-03261, 2014 Bankr. LEXIS 2915, at *9 (Bankr. S.D. Tex. July 7, 2014) (citing *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 38 (2d Cir. 1996) (stating that if possible, insolvency determinations should be based on seasonable appraisals or expert testimony, but that "[b]ecause the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101[(32)] by the most appropriate means").

The Trustee's expert witness, Christopher Quinn, did not perform a balance sheet insolvency test for SPI, citing time limitations and a lack of relevant information to value SPI's intangible assets to refute the book values. Nevertheless, Mr. Quinn did provide some commentary on this issue. Mr. Quinn's expert report noted that SPI's audited financial statements for 2011 through 2014 show goodwill at $367,210.[34] After the September 2014 Transaction, goodwill and other intangible assets were listed on the balance sheet in excess of $29 million, and total assets on SPI's balance sheet were shown to exceed total liabilities by roughly $19.6 million.[35] Mr. Quinn does not believe that these values provide a clear narrative of solvency, however, because intangible assets made up the majority of total assets. Mr. Quinn went on to state his opinion that given the historically low Altman Z scores and the valuation of goodwill prior to the July 2014 Transaction, the book value of goodwill is significantly overstated.[36]

---

[34] Defendant's Exhibit 109, p. 9.

[35] *Id.*

[36] *Id.*

Thompson Street's expert witness, Gene Deetz, did conduct a balance sheet test to measure the solvency of SPI and found that in his opinion, at fair valuation, SPI's assets exceeded its liabilities at the time of the September 2014 Transaction.  Mr. Deetz relied on asset values from a report produced by Transcend Valuation LLC for the July 2014 Transaction.  Given that SPI was undergoing a sale process at that time, Mr. Deetz valued the business as a going concern, which includes goodwill on the balance sheet.  Following the Fifth Circuit's instructions to estimate what the debtor's assets would realize if sold in a prudent manner in current market conditions, the Court believes that under the circumstances, goodwill and other intangible assets were properly considered in determining the solvency of SPI.  *Orix Credit*, 40 F.3d at 121; *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc*., 945 F.2d 635, 647 (3d Cir. 1991) ("[I]n determining insolvency . . . it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, *inter alia*, good will.").

Mr. Deetz likewise offered credible testimony as to the increase in goodwill following the July 2014 Transaction.  Mr. Deetz testified that goodwill cannot be recorded on a balance sheet until a transaction memorializes it.  Thus, the $367,210 of goodwill shown in SPI's financial statements for the period ending April 30, 2014 was the leftover goodwill memorialized in a previous transaction.  Simply put, this served as a recorded book value, and not much else.  Therefore, while the increase of goodwill to approximately $20 million appears to be sudden and drastic, this new number accurately represents the results of a competitive market transaction.

Mr. Deetz testified credibly that at the time of the September 2014 Transaction, SPI's assets, at a fair valuation, significantly exceeded its liabilities.  Mr. Deetz properly relied on industry data, market conditions, SPI's audited financial statements, and the results of a transaction between unrelated parties.  The Court concludes that the Trustee has not shown that SPI was

17

insolvent on the date of the Thompson Street Cash Transfer or that it became insolvent as a result of that transfer.

## 2. Unreasonably Small Capital or Knowingly Incurring Debt Beyond Ability to Repay

The adequate capital test examines whether the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital. The cash flow test examines whether the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. Because of the significant overlap of pertinent facts for these tests, the Court will analyze them together.

Neither the Bankruptcy Code nor the TBCC defines "unreasonably small" in regard to a debtor's capital structure. A leading case from the Third Circuit Court of Appeals, however, observed that "unreasonably small capital" refers to "the inability to generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992). To determine whether a corporation had unreasonably small capital, courts should compare the debtor's projected cash flow with the debtor's capital needs through a reasonable time after the challenged transfer. *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 396 (S.D. Tex. 2008). As the *Moody* court also explained:

> Because [a debtor's cash flow] projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses . . . . However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.[37]

---

[37] *Moody*, 971 F.2d at 1073.

Thus, the Court must determine whether any later cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue. *Id.*; *In re WRT Energy Corp.*, 282 B.R. 343, 411 (Bankr. W.D. La. 2001).

The Thompson Street Cash Transfer took place on September 19, 2014, and both SPI and Holding filed for bankruptcy on July 21, 2016, less than two years later, so problems obviously arose. The Court must look at circumstances as they existed in September 2014 though and determine what was reasonably foreseeable at the time of the September 2014 Transaction. This can be done in a few ways. The Court will begin by considering the issues relating to or affecting capitalization and cash flow that the parties claim were reasonably foreseeable. Next, the Court will consider what problems actually arose and whether they were reasonably foreseeable. And finally, the Court has the benefit of opposing experts who both analyzed circumstances at the time of the Thompson Street Cash Transfer and offered opinions on whether SPI was adequately capitalized and could satisfy the cash flow test at that time.

In support of his argument that the financial difficulties that arose for SPI were foreseeable at the time of September 2014 Transaction, the Trustee argues that all parties to the transactions knew that there might be immigration documentation issues within the workforce. This issue was discussed during Thompson Street's diligence prior to its acquisition of SPI, but SPI represented in the Stock Purchase Agreement that SPI was in compliance in all material respects with the Immigration Reform and Control Act of 1986.[38]

Nevertheless, shortly after Thompson Street's acquisition of SPI through the July 2014 Transaction, SPI began using E-Verify and parted ways with between ten and twelve experienced direct labor employees based on immigration documentation issues. Despite having

---

[38] Defendant's Exhibit 1, p. 24 (Stock Purchase Agreement section 3.23(g)).

approximately seventy direct labor employees, the particular employees who departed were among the most skilled and experienced. Mr. Barry Allen Winker, the Plant Manager of SPI at the time, testified that as a result of their departure, a less-skilled work force began creating mounting problems for the plant, including a growing "scrap rate" (a measure of wasted materials per finished product) and an increase in jobs requiring reworking.

While the departure of the skilled employees was certainly disruptive for SPI, there was conflicting evidence about the magnitude of the disruption. Mr. Winker testified that the loss of these employees was catastrophic, and Mr. Tim Friedel, the President and CEO of SPI at the time, generally seemed to agree. Thompson Street pointed out, however, that it would be very surprising if the loss of these employees could actually cause the business to fail in light of the fact that they did not have employment contracts, they were paid hourly, they saw regular turnover, and the President and CEO of SPI did not know any of their names. In addition, SPI was able to increase the amount of product shipped in the quarters following their departure.[39]

Even though the immigration issue was foreseeable by the time of the September 2014 Transaction and negatively affected SPI's efficiency, at least to some extent, a separate question is whether knowledge of this issue should have affected the way in which SPI was capitalized. The evidence does not support a conclusion that this was a problem that could have been solved with increased access to capital. Mr. Winker testified that he believed an immigration attorney could have found a solution, but he is not an expert on the matter and did not have first-hand knowledge of what could have been done or how much it would have cost. Mr. Friedel testified that SPI did not stop booking jobs after the loss of employees because SPI's management thought they could work through it. And critically, Mr. Winker testified that SPI had the opportunity to

---

[39] *See* Defendant's Exhibit 160, p. 9.

re-hire some of the employees later but the employees were not interested in returning because of the unpopularity of SPI's new Vice President of Operations. The Court cannot conclude, based on the reasonably foreseeable problems that would come along with enforcing immigration documentation policies, that SPI had unreasonably small capital or should have known that it would incur debts beyond its ability to repay.

The Trustee also argued that it was reasonably foreseeable that although SPI could not survive unless it continued to expand, the funding for capital expenditures was insufficient because Thompson Street expected such funding to come from SPI's own operating cash flow at a time when SPI was also required to service debt from the September 2014 Transaction. The Trustee argued that this problem was made foreseeably worse by Thompson Street's efforts to incentivize bookings. With regard to the source of funding for SPI's capital expenditures, the evidence did not show that it was unreasonable to rely on SPI's operating cash flows, even with the additional debt burden.[40] Between 2009 and 2014, capital expenditures were generally funded from operating cash flows and SPI was still able to make cash distributions to shareholders. With regard to the need for capital expenditures to increase plant capacity, it is not clear that SPI needed to spend as much as the Trustee suggests. Both Mr. Winker and Mr. Friedel testified that SPI's plant was not operating at capacity and could have increased production with more experienced employees, additional equipment, or more employees so that they could run multiple shifts. But to the extent money was needed to address operational issues, it appears to have been available. While not all of the capital expenditures planned at the time of the September 2014 Transaction occurred, not all of them were ultimately necessary, and machinery and fabrication equipment was purchased in

---

[40] This finding is supported by SPI's historical performance, SPI's anticipated capital expenditure needs, the cash needed to service SPI's debt, and the expert witness testimony.

2015. In addition, Mr. Friedel testified that SPI was able to increase its labor force, add capital equipment, and retain several operations consultants.[41]

Thompson Street did extensive due diligence and identified several additional risks and concerns with the acquisition of SPI, and these risks were discussed in an internal Investment Committee Memo prepared by Thompson Street.[42] Elizabeth Borow, the designated representative for Thompson Street, testified credibly that Thompson Street used less leverage than usual on this deal because of the risks that were identified prior to the acquisition and that after the September 2014 Transaction, SPI had access to capital both through its cash on hand and its revolving line of credit. Specifically, KPMG performed an independent audit of SPI's financial statements for the fiscal year ending on June 30, 2015.[43] In their opinion, the consolidated financial statements for the period from July 31, 2014, to June 30, 2015, are presented fairly, in all material respects. The consolidated balance sheet for this period shows $1,011,237 in cash and a $4,000,000 maximum line of credit with a total available draw amount on June 30, 2015, of $972,000.[44]

The actual problems that did arise also tend to support Thompson Street's position that SPI's business did not decline—and ultimately fail—because of inadequate capitalization. Mr. Friedel and Mr. Holiday testified that following the acquisition, SPI's customers chose to delay their projects, which interrupted production flow and cash flow for SPI. SPI was unable to consistently switch to other projects to keep production flowing and was instead faced with too many customers wishing to have their projects go forward in the same timeframe, which overloaded production. There was also a change in the product mix ordered by customers in 2015,

---

[41] Defendant's Exhibit 93.

[42] Trustee's Exhibit 30, p. 11; *see also* Trustee's Exhibit 31, p. 1 (risks noted in Investment Committee meeting minutes).

[43] Defendant's Exhibit 118.

[44] Defendant's Exhibit 118, pp. 3, 14.

with more customers ordering granite rather than limestone. According to Mr. Friedel, granite required significantly more production and fabrication time than limestone. Granite was a more difficult product for SPI to produce and caused SPI's production to become slower and less efficient. In addition, the general complexity of the orders received from customers increased significantly in 2015, which also caused SPI's production to become slower and less efficient. Finally, shortly after the acquisition, SPI hired a new Vice President of Operations, and it was generally agreed at trial that he had a significant detrimental effect on SPI's business. Indeed, the new Vice President of Operations came up during trial in several different contexts as different witnesses identified him as creating or exacerbating many of SPI's problems. The problems of increasing customer delays, a change in product mix, increasing complexity of orders, and a bad hiring decision were not reasonably foreseeable at the time of the September 2014 Transaction.

Finally, the Court heard testimony from both Mr. Quinn and Mr. Deetz on the adequate capital and cash flow tests, but found Mr. Deetz's testimony that SPI satisfied the adequate capital and cash flow tests at the time of the Thompson Street Cash Transfer to be significantly more persuasive. Mr. Quinn's analysis contained some errors, was based on some assumptions the Court did not find appropriate, and failed to consider some information the Court believes was relevant. With regard to errors,[45] Mr. Quinn's financial model overstated interest expense because it did not account for decreasing interest payments as principal payments were made. Mr. Quinn's model also had a problem with the line item for working capital requirements. Mr. Quinn was attempting to adopt Mr. Deetz's methodology for calculating working capital requirements, but Mr. Deetz

---

[45] Mr. Quinn prepared a supplemental report following Mr. Deetz's report's findings that Mr. Quinn had made several errors in his analysis, including using a flat income tax expense that does not account for any tax benefits related to the deductibility of interest expense. Defendant's Exhibit 110. Mr. Quinn remedied this tax error in his projections but maintained the ultimate findings from his previous report.

only increased working capital requirements based on increases in revenue. Mr. Quinn overstated working capital requirements based on the methodology he was trying to adopt.

With regard to assumptions, the Court believes Mr. Quinn's revenue growth assumption was not adequately supported and likely too low. In his financial model, Mr. Quinn assumed that SPI would not achieve any revenue growth in any year from 2015-2019.[46] Mr. Quinn opines that the projections from the management of SPI were unreasonable for revenue in June and July 2014, as "one would expect lower revenues during a transitional period given major changes in the Company,"[47] but Mr. Quinn does not provide any information regarding how long he would expect any such transitional period to last and does not cite industry data or market conditions to support his revenue projections. The Court also disagrees with Mr. Quinn's assumption that SPI would not have been able to refinance any amount of the debt owed to PrivateBank upon maturity, particularly because that debt would already be partially paid down by that time and SPI would likely have had assets to offer as security for such a refinance.

With regard to consideration of evidence, the Court questions Mr. Quinn's decision not to consider the forecasting and projections done by Thompson Street at the time of the acquisition. Thompson Street did significant due diligence before the transaction, talked to management, hired outside professionals to assist them, identified and considered risks, and believed enough in their work to invest a significant amount of money. Thompson Street's projections were already more conservative than those provided by the management of SPI. While Mr. Quinn certainly did not have to accept Thompson Street's conclusions, this information produced by a sophisticated party at the time of the transaction at issue should have at least been considered.

---

[46] Defendant's Exhibit 109.

[47] Defendant's Exhibit 109, p. 8.

By contrast, the Court believes Mr. Deetz properly considered all available information, relied on appropriate and justifiable assumptions, and conducted sound analysis. Mr. Deetz prepared a "base case," which he then tested through a sensitivity analysis. Prior to the July 2014 Transaction, Thompson Street twice adjusted the projections from Bigelow's investor presentation downward. The latter of these revisions provided Mr. Deetz with his "base case," as these were the financial projections that Thompson Street actually relied on when deciding to acquire SPI. To support his sensitivity analysis, Mr. Deetz relied on SPI's historical performance, historical and forecasted industry revenue growth from contemporaneous industry publications, historical performance of comparable companies, and other contemporaneous financial and economic data that was included in Thompson Street's due diligence. This Court finds Mr. Deetz's projections to be reliable and well-supported.

Based on the record before the Court, as of September 2014, it appeared that SPI would have sufficient access to cash to service its obligations and operate its business in a sustainable way. SPI was not engaged in a business or transaction, or about to engage in business or a transaction, for which any property remaining with SPI was an unreasonably small capital. The Trustee has not shown that SPI intended to incur, or believed it would incur, debts that would be beyond SPI's ability to pay as such debts matured.

## V. Conclusion

This case does not look like a typical fraudulent transfer. Thompson Street funded a $34 million acquisition and then later used the assets of SPI to finance just $14 million of that acquisition cost. Thompson Street had financial incentives to help SPI succeed, and Thompson Street worked very hard to do just that. Some insiders who had the option to sell their shares to Thompson Street, including SPI's President and CEO, chose to forego the cash and remain

invested.  If the transactions at issue put SPI on a path to failure, these problems were not reasonably foreseeable to those with perhaps the best knowledge of the business and the transaction.

It is true that SPI did not receive reasonably equivalent value in exchange for the Thompson Street Cash Transfer, but the requirement of fragile financial conditions has not been met.  For the reasons stated above, the Court finds the Trustee has not satisfied his burden of proof in meeting the elements of a fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code, section 24.005(a)(2) of the TBCC, or section 24.006(a) of the TBCC.  Because those claims fail, the remaining counts in the Second Amended Complaint against Thompson Street fail as well.  Accordingly, judgment will be entered on behalf of the Defendant.

### End of Findings and Conclusions ###